IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY LILLEY,

        Plaintiff,

                                        Case No. 22-CV-08

      v.

DEPUTY JOHN MATTHEWS,
LIEUTENANT KALVIN DORSHORST,
DEPUTY DEREK PHILLIPPI, and
WOOD COUNTY,

        Defendants.

## DEFENDANTS DEPUTY JOHN MATTHEWS, LIEUTENANT KALVIN DORSHORST, DEPUTY DEREK PHILLIPPI, AND WOOD COUNTY'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, Deputy John Matthews, Lieutenant Kalvin Dorshorst, Deputy Derek Phillippi, and Wood County, by their attorneys, Crivello Carlson, S.C., respectfully submit this Brief in Support of their Motion for Summary Judgment:

### STATEMENT OF FACTS

Pursuant to the Court's pretrial conference order, (Dkt. 8), the facts necessary to support this Motion for Summary Judgment are stated in the Defendants' statement of proposed findings of fact ("DPFF") filed contemporaneously herewith.

### ARGUMENT

**I.**     **SUMMARY JUDGMENT IS PROPER IF THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

Summary judgment is proper if the pleadings, depositions, answers to

interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Similarly, speculation, hearsay, and conclusory allegations will not suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Mills v. First Federal Savings & Loan*, 83 F.3d 833, 840 (7th Cir. 1996). Further, "[w]hen the non-movant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict." *Lawrence v. Kenosha County*, 304 F. Supp. 2d 1083, 1087 (E.D. Wis. 2004).

Additionally, "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it, and [courts] will not indulge stories clearly contradicted by the footage" at summary judgment. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir.

2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)); *see also Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1025 (W.D. Wis. 2020) (declining to credit plaintiff's testimony at summary judgment where video footage clearly contradicted the testimony); *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("[W]e assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

Here, the undisputed facts show that the Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims.

## II.    LILLEY'S CLAIMS ARE BARRED BY *HECK V. HUMPHREY*.

On December 11, 2020, Lilley was convicted of resisting or obstructing an officer contrary to Wis. Stat. § 946.41(1).[1] (DPFF, ¶ 141). Specifically, Lilley was charged with resisting an officer based on events on the evening of August 11, 2020, which also provide the basis for Lilley's claims in the matter, and was found guilty of resisting an officer after he pleaded no contest. (DPFF, ¶¶ 138-42). Because Lilley's conviction is incompatible with his allegations in this case, Lilley's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

"[W]hen a state prisoner seeks damages in a § 1983 suit, the district court *must* consider whether a judgment in favor of the plaintiff would necessarily imply the

---

[1]    The following information was obtained from Wisconsin Circuit Court Access, http://wcca.wicourts.gov/simpleCaseSearch.xsl (select "Wood County" from drop down menu, enter case number "20CF552" in the "case number" box and click "search") (last visited January 31, 2023). Court records are an "appropriate subject for judicial notice." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997). Moreover, "judicial notice may be taken at any stage of a proceeding." *Opoka v. I.N.S.*, 94 F.3d 392, 395 (7th Cir. 1996).

invalidity of his conviction or sentence." 512 U.S. at 487 (emphasis added). If the plaintiff's claims, if successful, would necessarily imply the invalidity of his conviction or sentence, then the plaintiff has "no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Id.* at 489. The Supreme Court made it clear that their holding in *Heck* "[did] not engraft an exhaustion requirement upon § 1983, but rather *den[ied] the existence of a cause of action*." *Id*, emphasis added.

The foregoing analysis is required whenever a convicted criminal brings a § 1983 claim, regardless of whether the plaintiff is incarcerated or, indeed, whether they were ever incarcerated at all. *See Savory v. Cannon*, 947 F.3d 409, 423 (7th Cir. 2020) ("This language suggesting that a section 1983 remedy must be available when habeas relief is unavailable is in conflict with footnote 10 of *Heck* and with our holding today."). Lilley does not allege that his Wood County conviction for resisting an officer has been "reversed, expunged, invalidated, or impugned." Therefore, if Lilley's claims "necessarily imply the invalidity" of his conviction, then he has no cause of action under § 1983 at all. A conviction for resisting arrest does not, in all cases, foreclose the possibility of an excessive claim. *See Tolliver v. City of Chicago*, 820 F.3d 237, 239 (7th Cir. 2016) ("it is certainly possible in the abstract for a claim of excessive force to survive *Heck*[.]"). However, in this case it does because Lilley's claims "rests on a version of the event that completely negates the basis for his conviction." *Id.*

In *Tolliver*, the plaintiff was shot multiple times after he drove his car toward two City of Chicago police officers. *See id.* at 239-41. "After pleading guilty to

aggravated battery to a peace officer, [the plaintiff] brought claims against the arresting officers for excessive force[.]" *Id.* at 239. To determine whether Tolliver's claims were *Heck*-barred, the Seventh Circuit first examined the elements of aggravated battery of a peace officer under Illinois law. *See id.* at 242 (quoting and synthesizing Illinois criminal statutes 720 ILCS 5/12–3.05(d)(4)(I), 720 ILCS 5/12–3, and 720 ILCS 5/4–1). The court then compared Tolliver's allegations with the elements of his criminal conviction. *Id.* The court noted that "Tolliver's conviction was based on voluntarily, and knowingly or intentionally causing bodily harm to Officer Sobieraj, without legal justification. But if the incident unfolded as Tolliver allege[d] in his civil suit, then he could not have been guilty of aggravated battery of a peace officer[,]" because "Tolliver's version of the event denie[d] any act that was knowing, intentional, voluntary and lacking legal justification that caused the harm to Officer Sobieraj. Instead, Tolliver affirmatively assert[ed] that he did not intentionally drive the car towards the officers[.]" *Id.* at 242, 244. The court therefore determined that "Tolliver's version of the shooting . . . implie[d] the invalidity of his conviction" because it lacked "any acknowledgment of the mental state necessary for a conviction for aggravated battery[.]" *Id.* at 243. The court ultimately concluded that "[b]ecause Tolliver [was] the master of his ground, and because the allegations he ma[de] . . . necessarily impl[ied] the invalidity of his conviction, *Heck* bar[red] his civil suit." *Id.* at 244.

Just as in *Tolliver*, Lilley's allegations in his complaint, along with his interrogatory responses and deposition testimony, are incompatible with his

conviction for resisting an officer. In order to convict Lilley of resisting an officer, there had to be a showing that:

> (1) [Lilley] resisted an officer, meaning he used force to oppose [Matthews, Dorshorst, and/or Phillippi]; (2) [Matthews, Dorshorst, and Phillippi were] acting in an official capacity; (3) [Matthews, Dorshorst, and Phillippi were] acting with lawful authority; and (4) [Lilley] knew [Matthews, Dorshorst, and Phillippi were] acting in [their] official capacit[es] and with lawful authority and that his conduct would resist the officer[s].

*State v. Young*, 2006 WI 98, ¶ 78, 294 Wis. 2d 1, 41, 717 N.W.2d 729, 749 (citing Wis JI—Criminal 1765); *see also* Wis. Stat. § 946.41(1). Multiple factual allegations in Lilley's complaint, if true, would "necessarily imply the invalidity" of Lilley's conviction by negating elements of the crime. *Heck*, 512 U.S. at 487.

Specifically, in his complaint Lilley alleged that:

> 10. The defendant officers demanded that Plaintiff Lilley get up and leave his bed.
>
> ***
>
> 13. Plaintiff Lilley followed the defendant officers' orders, and began to get up.
>
> 14. As he did, the defendant officers attacked Plaintiff Lilley.
>
> 15. The defendant officers grabbed Plaintiff Lilley and threw him to the floor.
>
> 16. While Plaintiff Lilley was face-down on the floor, Defendant Phillippi and Dorshorst secured his arms and legs.
>
> 17. While Plaintiff Lilley was face-down, and his arms and legs were secured, Defendant Matthews began to repeatedly strike Plaintiff Lilley in the torso with his knee.
>
> ***

> 23. At all times material hereto, the defendant officers used unnecessary, excessive and deadly force, including but not limited to, attacking Plaintiff Lilley, who was only complying with their orders.

(Dkt. 1, ¶¶ 10, 13-17, 23). In his interrogatory responses, Lilley stated that: "[He] was ordered to get off the bed. [He] was in the act of complying when Deputy Matthews, Phillipi [sic] and Dorshorst attacked [him]. . . . [He] received multiple knee-strikes to [his] right mid-section and [he] complied by putting [his] right arm behind [his] back." (DPFF, ¶ 129). Likewise, at his deposition, Lilley testified that he got out of bed because one of the Defendants told him to. (DPFF, ¶ 131). Lilley admitted that he "wasn't polite," but denied that he "resist[ed] the officer's efforts to detain [him] in any fashion." (DPFF, ¶¶ 133-34). Lilley also affirmatively stated that he "thought [he] was" following the Defendants' orders. (DPFF, ¶ 135).

Thus, under Lilley's version of events, he did not "use[] force to oppose" the Defendants or act with the knowledge that "his conduct would resist the officer[s]." *Young*, 2006 WI 98, ¶ 78. Like in *Tolliver*, Lilley's complaint lacks "any acknowledgement of the mental state" or indeed the physical acts, "necessary for a conviction for" resisting an officer. 820 F.3d at 243. Rather, "[Lilley's] version of events negates the mental state [and physical acts] necessary to support his conviction . . . and thus necessarily implies the invalidity of his conviction." *Id.* at 244. "[Lilley] ha[s] voluntarily steered the action into *Heck* territory by making specific factual allegations in the complaint that [are] inconsistent with the facts upon which his criminal conviction[] [was] based." *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir.

2006). Therefore, for all of the foregoing reasons, Lilley's claims in this case are barred by the Supreme Court's decision in *Heck v. Humphrey*.

## III. THE DEFENDANTS DID NOT USE EXCESSIVE FORCE IN VIOLATION OF LILLEY'S FOURTH AMENDMENT RIGHTS AS A MATTER OF LAW.

Even if this Court finds that Lilley's excessive force claim is not *Heck*-barred, the Defendants are entitled to summary judgment. "The Fourth Amendment's reasonableness standard governs [the Court's] evaluation of a plaintiff's claim that law-enforcement officers employed excessive force during an arrest, an investigatory stop or any other type of seizure." *Stainback v. Dixon*, 569 F.3d 767, 771 (7th Cir. 2009) (*citing Graham v. Connor*, 490 U.S. 386, 395 (1989)). To that end:

> [t]he nature and extent of the force that may be used depends upon the circumstances surrounding the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight."

*Id.* at 772 (quoting *Graham*, 490 U.S. at 396). Courts must consider these factors "as they would have appeared to a reasonable officer at the scene," and, in doing so, "recognize that officers often need to make split-second judgments based on rapidly developing events." *Id.* As the *Graham* Court explained, the reasonableness analysis is one focused on "reasonableness at the moment," such that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." 490 U.S. at 396–97 (internal quotations and citations omitted). Moreover, "[w]hen police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the

demands of the circumstances confronting them." *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002).

As such, caution is required when second-guessing a law enforcement officer's on-the-scene assessment of the danger presented by a particular situation. *See Ryburn v. Huff*, 565 U.S. 469, 475–77 (2012) ("The panel majority—far removed from the scene and with the opportunity to dissect the elements of the situation— confidently concluded that the officers really had no reason to fear for their safety or that of anyone else."). When an individual is resisting arrest, an officer may use the amount of force necessary to overcome his resistance. *See Stainback,* 569 F.3d at 772 ("An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest . . . ."); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592–93 (7th Cir. 1997) (holding that it was reasonable to restrain a suspect in a prone position where his violent resistance created a "need to incapacitate him and to protect the safety of the officers and other witnesses").

Courts "always judge a decision made . . . in an instant or two." *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994). As the Seventh Circuit has explained:

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.
>
> *So we carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage.*

*Id.* at 1150 (emphasis added).  Likewise, the sequence of force in this case must be divided up into discrete segments to properly evaluate the Defendants' reasonable use of force.

### A. Deputy Matthews' decision to tackle Lilley was objectively reasonable.

The first use of force that Lilley complains of was Deputy Matthews' decision to tackle Lilley— or in Lilley's words, when Deputy Matthews "attacked" him. (Dkt. 1, ¶ 14). However, as will be shown below, Deputy Matthews' decision to tackle Lilley was objectively reasonable in the moment and therefore not in violation of Lilley's Fourth Amendment rights.

The Defendants in this case were dispatched to Lilley's residence in response to a domestic disturbance call. (DPFF, ¶ 5). Deputy Matthews had also responded to Lilley's residence several weeks before for another domestic disturbance. (DPFF, ¶ 6). During that previous encounter, Deputy Matthews had learned that Lilley was "a very strong individual." (DPFF, ¶ 7). After arriving at the residence and making contact with Lilley, Deputy Matthews spent several minutes trying to verbally convince Lilley to sit up, put some clothes on, and speak to him about what had transpired that evening. (DPFF, ¶¶ 17-75). Lilley repeatedly refused to cooperate— lying down on his bed, telling Deputy Matthews to leave and turn off the lights, and stating that he did not know what had happened or why Ms. Bedford had called 9-1-1. (DPFF, ¶¶ 17-75). After several minutes at the residence and speaking with Lilley, the Defendants learned that Lilley was violating bond conditions for an existing

domestic abuse charge by being intoxicated and staying at the residence with Ms. Bedford. (DPFF, ¶¶ 80-81).

After learning this information, Deputy Matthews decided to arrest Lilley. (DPFF, ¶ 82). Deputy Matthews approached Lilley, who was still lying in bed and said, "Alright Jeff, you're not supposed to be here man, okay?" (DPFF, ¶ 83). In response to this statement, Lilley half sat up and yelled, "This is my house. I live here!" while gesticulating wildly. (DPFF, ¶ 84). In response, Deputy Matthews repeated to Lilley—"You gotta put your shorts on." (DPFF, ¶ 85). Meanwhile, Lieutenant Dorshorst was standing at the foot of the bed, holding a pair of shorts he had found on the floor. (DPFF, ¶ 85). Lilley shouted, "No I'm not!" (DPFF, ¶ 86). Mr. Lilley then shouted, "Fuck you!" pulled the blanket off himself, stood up, and lunged toward Lieutenant Dorshorst. (DPFF, ¶ 86). In response, Deputy Matthews tackled Mr. Lilley. (DPFF, ¶¶ 87, 90).

In his complaint, Lilley alleged that he was only following Matthews' orders when he began to get up and that Matthews unreasonably attacked him. (*See* Dkt. 1, ¶¶ 10-14). Lilley also testified to this version of events at his deposition. (DPFF, ¶¶ 130-31). There are a couple problems with this contention. First, even if Lilley's Fourth Amendment claim is not *Heck*-barred in its entirety, he is precluded from making factual contentions that are inconsistent with his conviction for resisting an officer. *See Mordi v. Zeigler*, 870 F.3d 703, 708 (7th Cir. 2017) ("if Mordi filed a complaint that included some *Heck*-barred contentions and other cognizable arguments . . . the judge must carve off any *Heck*-barred contentions and proceed with

11

what remains."). The criminal complaint against Lilley was based, in part, on the allegation that he "yelled, 'fuck you' and lunged towards Lt. Dorshorst." (DPFF, ¶ 139). Second, for the purposes of the Fourth Amendment analysis, it does not matter whether Lilley subjectively intended to grab the proffered shorts or Lieutenant Dorshorst himself. *See Dockery v. Blackburn*, 911 F.3d 458, 463 (7th Cir. 2018) ("Whether Dockery actually intended to resist does not matter."). Rather, "[w]hat matters is how a reasonable officer would construe the circumstances." *Id.*

Prior to the initial use of force, Lilley had spent several minutes belligerently refusing to comply with orders to get out of bed, get dressed, and speak with the Defendants. (DPFF, ¶¶ 17-75). Nothing about Lilley's demeanor, words, or actions up to and including the moment he lunged out of bed would prevent a reasonable officer from concluding that Lilley posed a threat to Lieutenant Dorshorst. (DPFF, ¶¶ 17-75, 82-86). Quite the opposite—the words Lilley shouted as he was sitting up ("No I'm not! Fuck you!")—belied any intention to comply. (DPFF, ¶ 86). As Matthews explained at his deposition:

> [Lilley] was intoxicated, belligerent, uncooperative and verbally aggressive, and when we had asked him I don't know the number of times to put the shorts on, he basically said, "No, I'm not going to do that," and shot up from his lying position towards the foot of the bed where Lieutenant Dorshorst was, and as he was popping up out of his bed, he's like, "Fuck you," for the umpteenth time, that's when I began – that's when the incident began as far as force.

(DPFF, ¶ 88).

Based on everything that had transpired up to that point, Matthews was not obligated to wait to see what Lilley was lunging toward before he took action. *C.f.*

*Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) ("Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety."). Rather, Matthews, like any reasonable officer under the circumstances, "reasonably believe[d] it was necessary to tackle [Lilley] to protect [Lieutenant Dorshorst.]" *Dawson v. Brown*, 803 F.3d 829, 834 (7th Cir. 2015). Therefore, for all of the foregoing reasons, Deputy Matthews' decision to tackle Lilley did not violate Lilley's Fourth Amendment rights and the Defendants are entitled to summary judgment on this claim.

## B. Matthew's decision to issue knee strikes to Lilley's ribs was objectively reasonable.

As explained above, "[w]hen police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them." *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002). That is exactly what Matthews did in this case. After Matthews tackled Lilley, after a few seconds of struggle, Lilley ended up kneeling on the floor beside his bed with Matthews half-kneeling on the bed behind Lilley. (DPFF, ¶¶ 92-93). Lieutenant Dorshorst restrained Lilley's legs to prevent him from kicking. (DPFF, ¶ 94). Deputy Phillippi then entered the fray and placed Lilley's left arm behind his back. (DPFF, ¶ 95).

Deputy Matthews ordered Lilley to place his right arm behind his back and to stop resisting. (DPFF, ¶ 97). Lilley did not move his right arm and Deputy Matthews felt resistive tension in his arm. (DPFF, ¶¶ 98-99). Deputy Matthews therefore

delivered six or seven knee strikes to the right side of Lilley's ribcage. (DPFF, ¶ 100). After that, Deputy Matthews was able to place Lilley's right arm behind his back. (DPFF, ¶ 104). Lilley then stated that he could not breathe. (DPFF, ¶ 105). After Lilley was handcuffed, the Defendants helped Lilley roll to his side and sit up. (DPFF, ¶¶ 106-07).

In his complaint, Lilley alleged that "[w]hile Plaintiff Lilley was face-down, and his arms and legs were secured, Defendant Matthews began to repeatedly strike Plaintiff Lilley in the torso with his knee." (Dkt. 1, ¶ 17). In addition, he alleged that "[b]y the time Defendant Matthews began to repeatedly knee Plaintiff Lilley in the torso, Defendants Dorshorst and Phillippi had effectively secured and arrested Plaintiff Lilley (alebit [sic] with excessive force)." (Dkt. 1, ¶ 27). However, Lilley was not prone as his complaint suggests—rather, his knees were tucked under him. (DPFF, ¶ 92). Nor were his arms and legs secured. (DPFF, ¶¶ 94-99). Lilley's right arm was unsecured, and he was actively resisting Matthews' attempts to place his right arm behind his back. (DPFF, ¶¶ 94-99).

It is, or course, "well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). However, "that principle depends critically on the fact that the suspect is indeed subdued." *Id.* As explained above, Lilley is precluded from making factual contentions that are inconsistent with his conviction for resisting an officer. *See Mordi v. Zeigler*, 870 F.3d at 708. The criminal complaint against Lilley was based, in part, on the allegation that he "physically

14

resisted efforts to handcuff him[.]" (DPFF, ¶ 140). At his deposition, Lilley denied resisting the Defendants in any fashion. (DPFF, ¶ 134). Lilley testified that he could not get his hand behind his back because it was pinned underneath him but after Matthews kneed him, Matthews "finally . . . yanked [Lilley's] hand out from under [him] and handcuffed [him]." (DPFF, ¶¶ 136-37). Therefore, Lilley's version of events as to what transpired just before and as Matthews was kneeing him is inconsistent with his conviction for resisting.

To the extent that Lilley's version of events does not "necessarily imply the invalidity of his conviction," *Heck*, 512 U.S. at 487, and to the extent that it is not "blatantly contradicted" by video evidence, *Scott v. Harris*, 550 U.S. 372, 380 (2007), because Lilley is the non-moving party, the court must "view all facts and draw all inferences in [his] favor." *Smith v. Ball State Univ.*, 295 F.3d 763, 767 (7th Cir. 2002). However, even if it is "accept[ed] as true the fact that [Lilley] was not actively resisting, a reasonable officer who happened on the scene could reasonably misconstrue" Lilley's actions as resistance requiring a use of force response. *Id.* at 771. From Deputy Matthews' perspective—and the perspective of a reasonable officer—Lilley had just aggressively lunged at Lieutenant Dorshorst. (DPFF, ¶¶ 87-89). Seventh Circuit case law demonstrates that officers do not risk violating the Fourth Amendment by failing to immediately accede to apparent surrender or by reasonably misinterpreting ambiguous actions as resistance.

For example, in *Johnson*, the plaintiff, "a suspect in a shooting[,] . . . fled police first by car and then on foot." 576 F.3d at 659. Johnson was pursued on foot by the

defendant, Scott, and his police dog, Archer. *Id.* When, during the foot chase, Johnson "encountered a five-foot-tall wooden fence that blocked his progress . . . he turned around, put his arms in the air, and said 'I give up.'" *Id.* By that point:

> Scott and Archer were only six to eight feet behind Johnson . . . Archer grabbed Johnson's left arm, and Scott knocked Johnson to the ground with his forearm. Johnson was struggling to get away from Archer's biting, but Scott interpreted this as resistance, and so he struck Johnson several times to subdue him. When Archer moved to bite Johnson's upper left leg, Scott was able to get a grip on Johnson's left arm and successfully handcuff him.

*Id.* at 659–60.

Johnson argued "that it was unreasonable for Scott to use Archer or strike Johnson after he had put his hands in the air and said 'I give up.'" *Id.* at 660. The Seventh Circuit rejected this argument noting that, "[n]o law that [it knew] of required Scott to take Johnson's apparent surrender at face value, a split second after Johnson stopped running." Given the totality, and uncertainty, of the circumstances, the court concluded that "Scott's use of force—in the form of Archer—to subdue Johnson was objectively reasonable[.]" *Id.* at 660–61.

Likewise, in *Smith*, a diabetic student drove his car "onto a sidewalk on Ball State's campus" during a medical episode. 295 F.3d at 766. Smith was reported to campus police dispatch as a possible drunk driver. *Id.* The first two officers, Foster and Rogers, who arrived on scene found Smith to be unresponsive and had difficulty extracting him from his car. *Id.* Another officer, Hodson, arrived on scene later and:

> [b]ecause Foster and Rogers were forcibly removing Smith from his vehicle, [he] believed that the three individuals were engaged in a struggle. As a result, Officer Hodson jumped across the hood of Smith's vehicle and attempted to apply a "knee strike" to Smith's leg. However,

16

>   Officer Hodson slipped and, rather than apply a knee strike, tackled
>   Rogers, Foster and Smith.

*Id.* Smith brought an excessive claim against the three officers based, in part, upon "Officer Hodson's failed attempt to apply a 'knee strike[.]'" *Id.* at 770. The Seventh Circuit found that Hodson was entitled to summary judgment because although it "accept[ed] as true the fact that Smith was not actively resisting, a reasonable officer who happened on the scene could reasonably misconstrue Smith's unresponsiveness as resistance requiring the minimal use of force. Thus, Officer Hodson's attempt to apply a knee strike . . . did not violate the Fourth Amendment." *Id.* at 771.

The applicable lesson from *Johnson* is that Matthews was not "required . . . to take [Lilley's] apparent surrender at face value[.]" 576 F.3d at 660; *see also Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 728 (7th Cir. 2013) ("And even assuming that Travis had ceased resisting prior to these last three tasings, Deputy Sweeney reasonably could have believed that Travis had not ceased resisting."). From Matthews' perspective, Lilley had just attacked Dorshorst. (DPFF, ¶¶ 86-88). Matthews was not obligated to assume that Lilley had surrendered, or was subdued, simply because Lilley was on the ground and three of his limbs were restrained.

The applicable lesson from both *Johnson* and *Smith* is that a reasonable misapprehension of another person's intentions is not a Fourth Amendment violation. In *Johnson*, the plaintiff "was struggling to get away from Archer's biting, but Scott interpreted this as resistance, and so he struck Johnson several times to subdue him." 576 F.3d at 659. In *Smith*, the Seventh Circuit held that "a reasonable officer . . . could reasonably misconstrue Smith's unresponsiveness as resistance" justifying a

knee strike. 295 F.3d at 771. In this case, it was reasonable for Matthews to believe that Lilley would not, rather than could not, comply with his orders to place both of his hands behind his back. Therefore, for all of the foregoing reasons, Lilley cannot demonstrate that Deputy Matthews violated Lilley's Fourth Amendment rights by delivering knee strikes to his torso. For this additional reason, the Defendants are entitled to summary judgment.

**C. All other uses of minimal force on Lilley were reasonable.**

In addition to the allegations discussed above, Lilley alleges generally that all of "the defendant officers attacked Plaintiff Lilley . . . and threw him to the floor[,]" (Dkt. 1, ¶¶ 14, 15), and that "Defendants Dorshorst and Phillippi . . . effectively secured and arrested Plaintiff Lilley (alebit [sic] with excessive force)." (Dkt. 1, ¶ 27). However, it cannot be reasonably disputed that Dorshorst and Phillippi's uses of force were confined to restraining Lilley's legs and left arm. (DPFF, ¶¶ 94-95). In addition, after Lilley was handcuffed, the use of force ceased; the Defendants helped Lilley sit up, helped him use his inhaler, and helped him back onto his bed. (DPFF, ¶¶ 106-123). "An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest[.]" *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). Dorshorst and Phillippi used a minimal amount of force to help effectuate a lawful arrest. (DPFF, ¶¶ 94-95). Therefore, Dorshorst and Phillippi's use of force was objectively reasonable and they are entitled to summary judgment on Lilley's excessive force claim.

## IV.   THE DEFENDANTS DID NOT FAIL TO INTERVENE IN VIOLATION OF THE FOURTH AMENDMENT.

Forecasting the force he primarily takes issue with, Lilley has pleaded a claim against Lieutenant Dorshorst and Deputy Phillippi based on their alleged failure to intervene when "Defendant Matthews began to repeatedly knee Plaintiff Lilley in the torso[.]" (Dkt. 1, ¶ 27). As will be shown below, Dorshorst and Phillippi are entitled to summary judgment on Lilley's failure to intervene claim because there was no underlying constitutional deprivation and, even if there were, neither had a realistic opportunity to intervene.

In *Yang v. Hardin*, the Seventh Circuit set out the test for evaluating whether an officer violated the duty to intervene:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

37 F.3d 282, 285 (7th Cir. 1994).  Without an underlying violation of a plaintiff's constitutional rights, intervention is not required. *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004).

At the outset, Dorshorst and Phillippi cannot be liable for failing to intervene in the *constitutional* actions of Matthews because, when a plaintiff's constitutional rights are not being violated, intervention is not required. *Fillmore*, 358 F.3d at 506. As explained above, Matthews' uses of force against Lilley were objectively reasonable

as a matter of law, and therefore they were not excessive or unconstitutional. Because an underlying constitutional violation is necessary to a failure to intervene claim, neither Dorshorst nor Phillippi can be liable for failing to intervene in Matthews' constitutional uses of force against Lilley.

As discussed above, in response to Lilley's continued resistance, Matthews delivered a series of focused knee strikes to Lilley's torso in quick succession. (DPFF, ¶ 100). Dorshorst and Phillippi could not know in advance that Matthews planned to employ knee strikes. These undisputed facts show that Dorshorst and Phillippi did not "ha(ve) a realistic opportunity to intervene." *Yang*, 37 F.3d at 285. Therefore, they cannot, as a matter of law, be liable for failing to intervene in Matthews' use of force, even assuming for the sake of argument that such strikes were unconstitutional.

This conclusion is well supported by Seventh Circuit case law. In *Lanigan v. Vill. of E. Hazel Crest, Ill.*, the plaintiff, Lanigan, brought an excessive force claim "alleg[ing] that Sergeant Krane '. . . . violently poking and pushing the plaintiff stated "we know what to do with you."'" 110 F.3d 467, 469 (7th Cir. 1997). Lanigan also brought a failure to intervene claim against the chief of police who was also at the scene. *Id.* at 477. The Seventh Circuit held that because the complained-of use of force was so brief, "Chief Robertson could [not] know or be deliberately indifferent to Sergeant Krane's actions. Chief Robertson could not have undertaken any action to 'un-do' any alleged constitutional violation by Sergeant Krane. Most importantly . . . Chief Robertson did not have a realistic opportunity to intervene."

20

*Id.* at 478.  Likewise, in this case, Dorshorst and Phillippi did not have a realistic opportunity to process or react to Matthews' use of force, let alone *prevent* Matthews from kneeing Lilley.  Accordingly, even assuming solely for the sake of argument that Matthews' use of force was unreasonable, Dorshorst and Phillippi are still entitled to judgment as a matter of law as to Lilley's failure-to-intervene claims.

## V.    ALTERNATIVELY, THE INDIVIDUAL CITY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON ALL OF PLAINTIFF'S SECTION 1983 CLAIMS.

"Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013).  One of the purposes of qualified immunity is to allow for reasonable errors "'because officials should not err always on the side of caution [for] fear [of] being sued.'" *Humphrey v. Staszek*, 148 F.3d 719, 727 (7th Cir. 1998) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227.

For Lilley to defeat qualified immunity, he must show "(1) conduct violating [his] constitutional or statutory rights that is (2) clearly established at the time of the violation such that a reasonable official would understand that what he is doing violates that right." *Findlay*, 722 F.3d at 899 (internal quotations and citations omitted).  The Court has the discretion to decide which prong to address first, and, "[i]f the answer to either question is no, [the Defendants are] entitled to summary judgment." *Thompson v. Cope*, 900 F.3d 414, 420 (7th Cir. 2018).  Thus,

21

even if the Defendants were found to have violated one of Lilley's constitutional rights, they are still shielded from liability "if the right was not clearly established at the time of the violation." *Findlay*, 722 F.3d at 899.

It is Lilley's burden to show that the law clearly established his Fourth Amendment rights in the context of the undisputed facts in August 2020. *See Findlay*, 722 F.3d at 899. To meet this burden, Lilley does not need to "point to an identical case finding the alleged violation unlawful, but existing precedent must have placed the statutory or constitutional question beyond debate." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (internal quotations and citations omitted). Only in "rare cases" might a plaintiff demonstrate clearly established law just by showing that the alleged constitutional violation was "so egregious and unreasonable," or "patently obvious," that "no reasonable official could have thought he was acting lawfully." *Id.* at 351, 354 (internal alterations, quotations, and citations omitted).

"Before [the Court] can determine if the law was clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity.'" *Kemp*, 877 F.3d at 351 (quoting *Wilson*, 526 U.S. at 615); *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019) ("Over and over, the Supreme Court has held that a right is 'clearly established' only if it has been 'defined with specificity.'") (collecting cases). This means that "[c]learly established law 'must be "particularized" to the facts of the case.'" *Thompson*, 900 F.3d at 421 (quoting *White v.* Pauly, 580 U.S. 73, 79 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))).

"The Supreme Court has expressly rejected over-general formulations of clearly established law in the Fourth Amendment context." *Kemp*, 877 F.3d at 352. For example, while "the Supreme Court addressed the constitutionality of excessive and deadly force" in the two landmark cases of *Garner*, 471 U.S. 1, and *Graham*, 490 U.S. 386, "the Supreme Court has made clear that *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Mason-Funk v. City of Neenah*, 895 F.3d 504, 508 (7th Cir. 2018) (internal quotations omitted). Recently, the Court again reminded lower courts of the importance of specificity in excessive-force cases:

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . . .

*City of Escondido, Cal. v. Emmons*, 586 U.S. ---, 139 S. Ct. 500, 503 (2019) (internal quotations and citations omitted); *see also Wonsey v. City of Chicago*, 940 F.3d 394, 400 (7th Cir. 2019) (citing and quoting *Emmons* as "reiterat[ing the Court's] 'settled principles'" on qualified immunity). Lilley cannot meet this exacting standard.

## A.   The Defendants are Entitled to Qualified Immunity with Respect to Their Uses of Force.

Given the reasons they were dispatched to the scene and Lilley's behavior once they got there, the Defendants' use of force to restrain Lilley was reasonable. *See Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1022 (W.D. Wis. 2020) ("The use of

excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and so, police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."); *Dockery v. Blackburn*, 911 F.3d 458, 468–69 (7th Cir. 2018) ("Even if the officers misconstrued his actions or misjudged the amount of force needed to subdue him, qualified immunity protects officers from mistakes in judgment of this sort."). As explained above, Lilley is precluded from making factual contentions that are inconsistent with his conviction for resisting an officer. *See Mordi v. Zeigler*, 870 F.3d 703, 708 (7th Cir. 2017). Lilley can point to no case law placing the constitutionality of level of force used here against an actively resisting subjecting "beyond debate." *Kemp*, 877 F.3d at 351.

Rather, as the case law discussed above demonstrates, the facts here compare favorably to cases in which the Seventh Circuit has found uses of force to be constitutional. In addition to the resemblance to *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009), the facts of this case bear a resemblance to a recent case in this circuit in which a defendant was found to be entitled to qualified immunity on the plaintiff's excessive force claim based on multiple knee strikes. In *Stewardson v. Cass County*, the plaintiff was "arrested . . . for operating a vehicle while intoxicated and resisting law enforcement. At the jail, he physically struggled with law enforcement[.]" No. 3:18-CV-958 DRL-MGG, 2021 WL 878726, at *1 (N.D. Ind. Mar. 9, 2021), *on reconsideration in part*, No. 3:18-CV-958 DRL-MGG, 2021 WL 4806373 (N.D. Ind. Oct. 14, 2021), *appeal dismissed sub nom. Stewardson v. Biggs*, 43 F.4th 732 (7th Cir.

24

2022). At one point during the fracas, Stewardson was on the ground with a handcuff on one hand while several officers attempted to restrain him. *Id.* The resistance continued:

> Mr. Stewardson, while continuously resisting law enforcement's efforts, tried pulling his right arm away from [Defendant] Deputy Biggs while kicking another officer. Deputy Biggs responded with a "common peroneal knee strike" on Mr. Stewardson. . . . After the handcuffs were removed, Mr. Stewardson again resisted officers, so Deputy Biggs performed a second peroneal knee strike. Throughout this period, Mr. Stewardson continued yelling threats and obscenities at the officers.

*Id.* at *2. Stewardson brought an excessive force claim against several defendants, including Deputy Biggs, based on his delivery of the knee strikes. The district court determined that Biggs was entitled to qualified immunity on Stewardson's excessive force claim because:

> Mr. Stewardson doesn't cite any closely analogous cases—indeed, he cites none—and the court finds none from its independent review. To the contrary, courts have held that knee strikes are often reasonable when confronted with an individual resisting law enforcement. *See Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002); *Pullen v. House*, 88 F. Supp.3d 927 (W.D. Wis. 2015). It is a use of force to subdue someone who is actively resisting without resorting to more severe measures of force. On this record, the knee strikes here weren't violating a constitutional right that was clearly established, particularly when the detainee was verbally aggressive, threatening, unpredictable, and unwilling to cooperate, nor were the knee strikes objectively unreasonable. . . . In the heat of these tense moments, a reasonable officer wouldn't believe that what Deputy Biggs did was obviously unconstitutional. He is entitled to qualified immunity.

*Id.* at *6.

Likewise, in this case, the Defendants were confronted by Lilley's perceived attack on Lieutenant Dorshorst and Lilley's subsequent resistance to being handcuffed. Thus, in light of the undisputed circumstances before the Defendants

25

and the clearly established law in August 2020, at the very least, the Defendants are entitled to qualified immunity as to Lilley's excessive force claims.

**B.      Dorshorst and Phillippi are Entitled to Qualified Immunity with Respect to Their Duties to Intervene.**

If the Court finds that Matthews is entitled to qualified immunity for his use of force against Lilley, then Dorshorst and Phillippi cannot be liable for a failure to intervene. *See Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("Gill's right to be free from these interrogation tactics was not clearly established. It follows then, that the detectives would not have known a constitutional violation was committed, and therefore, cannot be liable for failure to intervene.").

In addition, even if Matthews is not entitled to summary judgment for the administration of the knee strikes, Dorshorst and Phillippi are entitled to qualified immunity with respect to their alleged duty to intervene. A duty to intervene only exists if the "officer had reason to know . . . that excessive force was being used[.]" *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Dorshorst and Phillippi had just witnessed Lilley lunge at Dorshorst. (DPFF, ¶ 86). Dorshorst, in particular, felt physically threatened by Lilley before and as Lilley lunged at him. (DPFF, ¶ 89). While Matthews was delivering the knee strikes, Dorshorst was occupied with restraining Lilley's legs, and Phillippi was busy restraining Lilley's left arm. (DPFF, ¶¶ 94-95). Phillippi, at least, saw Matthews issue the knee strikes. (DPFF, ¶ 101). However, Phillippi and Dorshorst had no way of knowing how forceful the strikes were or how forcefully Lilley was resisting Matthews' attempts to place Lilley's right arm behind his back. Like Matthews, Dorshorst and Phillippi were not "required . . .

to take [Lilley's] apparent surrender at face value[.]" *Johnson*, 576 F.3d at 660. "[Q]ualified immunity protects actions in the 'hazy border between excessive and acceptable force.'" *Mullenix v. Luna*, 577 U.S. 7, 18 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)). At the very least, Matthews' use of force, and Phillippi and Dorshorst's perception of that force fall somewhere inside that "hazy border." Accordingly, for all the foregoing reasons, Dorshorst and Phillippi are entitled to qualified immunity on Lilley's failure to intervene claim.

## VI.   LILLEY IS NOT ENTITLED TO PUNITIVE DAMAGES AS A MATTER OF LAW.

Punitive damages are only recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 35, 51 (1983); *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir.2004). The Seventh Circuit has interpreted the standard jury instruction for §1983 punitive damages as placing the defendant's conduct into one of two categories: (1) "the defendant actually derives satisfaction from hurting the plaintiff"; and (2) "the defendant, while not having any particular desire to hurt the plaintiff, tramples on the plaintiff's rights, in a fashion that can fairly be called reckless, to accomplish his own aims." *Soderbeck v. Burnett County, Wis.*, 752 F.2d 285, 289–90 (7th Cir. 1985). In *Soderbeck*, the court went on to illustrate the two categories as follows:

> If a man sets fire to a house intending to kill the occupants, he is a deliberate murderer; if he sets fire to a house he knows to be occupied, but does so to warm himself rather than to kill the occupants, he is a reckless murderer. But

> he is a murderer in either case, and would be subject
> to punitive damages in a suit for wrongful death.

*Id.*

Here, Lilley cannot show that the Defendants was "motivated by evil motive or intent" nor that they acted with "reckless or callous indifference to [their] federally protected rights." *Smith*, 461 U.S. at 56. Prior to Lilley lunging at Lieutenant Dorshorst, Deputy Matthews spent several minutes trying to verbally convince Lilley to get out of bed, put some clothes on, and cooperate. (DPFF, ¶¶ 17-75). Immediately after Lilley was handcuffed, the Defendants helped Lilley sit up, located his inhaler, and then helped him back onto the bed. (DPFF, ¶¶ 106-15). These acts are antithetical to a showing of reckless or callous indifference. Nothing in the Defendants' body camera footage or deposition testimony comes close to resembling a reckless or callous mindset, let alone evil motive or intent.

Put simply, Lilley's claim for punitive damages finds no support whatsoever in the record, and that claim should not go to the jury, even in the event that Lilley's underlying claims survive summary judgment. Accordingly, the Defendants are entitled to judgment as a matter of law on Lilley's punitive damages claim.

## VII. LILLEY DOES NOT HAVE A COGNIZABLE CLAIM FOR "INDEMNIFICATION" AGAINST WOOD COUNTY.

Lilley named Wood County has a defendant in his complaint but did not articulate a claim against the County. (*See generally* Dkt. 1). Rather, Lilley alleges that "Wood County is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against these individual employees defendant in this action because said defendants were acting within the scope of his employment when he committed the acts

described above." (*See id.*, ¶¶ 3, 25, 30, 36). That may be so. However, Wis. Stat. § 895.46 "does not provide a private cause of action for indemnification" against the County, but instead "provides for the [municipality] to pay the damages[, if any,] on behalf of" the public officer or employee. *Jackson v. Graves*, No. 14-cv-1206-pp, 2015 WL 5577527, at *4 (E.D. Wis. Sep. 22, 2015). Accordingly, Wood Count is not a proper party as a matter of law and should be dismissed.

## CONCLUSION

Based on the foregoing, Defendants Deputy John Matthews, Lieutenant Kalvin Dorshorst, Deputy Derek Phillippi, and Wood County respectfully request that the Court grant summary judgment in their favor and dismiss all claims against them in full, in their merits, with prejudice, and with an award of such costs and disbursements that the Court deems equitable.

Dated this 3rd February, 2023.

> CRIVELLO CARLSON, S.C.
> Attorneys for Defendants Deputy John
> Matthews, Lieutenant Kalvin Dorshorst,
> Deputy Derek Phillippi, and Wood County
>
> By:*/s/electronically signed by Timothy M. Johnson*
> SAMUEL C. HALL, JR.
> State Bar No.:  1045476
> TIMOTHY M. JOHNSON
> State Bar No. 1052888
> MOLLY K. WOODFORD
> State Bar No. 1126884

Post Office Address:
7 S. Dewey St., Ste. 120
Eau Claire, WI 54701
Telephone: 715-598-1730

Fax: 715-598-1731
shall@crivellocarlson.com
tjohnson@crivellocarlson.com
mwoodford@crivellocarlson.com