IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

JEFFREY LILLEY,

        Plaintiff,

v.

JOHN MATTHEWS, DEREK PHILLIPPI,
and KALVIN DORSHORST,

        Defendants.

OPINION AND ORDER

22-cv-8-slc

---

In this civil rights action brought pursuant to 42 U.S.C. § 1983, plaintiff Jeffrey Lilley contends that Wood County deputy sheriffs John Matthews, Derek Phillippi, and Kalvin Dorshorst violated his rights under the Fourth Amendment while taking Lilley into custody in connection with a domestic disturbance on August 11, 2020. Specifically, Lilley contends that Matthews used excessive force against him by tackling him off his bed and onto the floor and by administering a series of knee strikes to Lilley's right side in the process of handcuffing his hands behind his back. He further contends that Phillippi and Dorshorst violated his rights by failing to stop Matthews from delivering the knee strikes.

Defendants have moved for summary judgment on the ground that they didn't violate the Fourth Amendment and even if they did, they are entitled to qualified immunity. Dkt. 10. They further contend that Lilley is barred under *Heck v. Humphrey* from pursuing his excessive force claim based on the knee strikes because his allegations are incompatible with his conviction for resisting arrest. For reasons stated below, I am granting the motion for summary judgment and dismissing this case.

UNDISPUTED FACTS

The following facts, which are mainly derived from the videos, are undisputed unless otherwise noted:

Around 9 p.m. on August 11, 2020, Wood County dispatch received a call of a possible domestic disturbance at 2610 32nd Street North in Biron, Wisconsin. The address was for a residence shared by plaintiff Jeffrey Lilley and Valentina Bedford. Wood County deputies John Matthews and Derek Phillippi, along with patrol lieutenant Kalvin Dorshorst, responded to the dispatch. All three wore body cameras that recorded video and audio of the incident.

Deputy Matthews, who was first on the scene, was familiar with the residence and with Lilley, having responded to a similar call several weeks earlier. Deputy Matthews knew from that experience that Lilley was "a very strong individual." Matthews entered the residence with his gun drawn, announced that he was with the Sheriff's Department, and began searching for Lilley and Bedford. He found Bedford in a bedroom. She told him that Lilley was in another bedroom across the hall and he did not have a gun.

Matthews opened Lilley's bedroom door, turned on the lights, holstered his weapon, and announced that he was with the Sheriff's Department. By then, Lt. Dorshorst had arrived, and he entered the bedroom behind Matthews. (Phillippi had arrived at the residence, as well; he was focused on trying to learn from Bedford what had led to the police being called.) Lilley was lying naked in bed with a blanket over him. Lilley responded to the deputies' intrusion with surprise and anger, shouting, "What the fuck?!" Matthews asked Lilley to stand up, turn around, and put his hands behind his back, stating that he wanted to talk to Lilley. Lilley, who continued

to lie on his bed, said, "No. You just get out of my house right now." It was plain to both Matthews and Dorshorst that Lilley was intoxicated.

Matthews asked Lilley what was "going on tonight" and tried to ascertain what had happened and why the police had been called. Lilley told the deputies he didn't know, that he was in bed, and that Bedford was "drunk again." After asking Lilley a few more questions and getting no answers, Matthews asked Lilley again if he would get some clothes on and come talk to him. Lilley responded, "No! Leave me alone. I'm tired of this shit." This verbal back-and-forth continued, with Matthews posing questions to Lilley in a calm voice. Lilley responded, angrily at times, he did not get out of bed, and he again asked Matthews to leave him alone.

Matthews again asked Lilley to get out of bed and speak with him; Lilley again refused, stating, "I ain't getting up. I'm talking right now. Why do I have to get up?" Matthews responded that he wanted to figure out what was going on, to which Lilley responded that "I just told you what's going on. Ask her– she's . . . she's doing dope." At that point, Lilley noticed Lt. Dorshorst, who was standing near the end of the bed, and asked, "Whatcha looking at?" Dorshorst gestured at a pile of clothes and told Lilley he was going to get him a pair of shorts to put on. Lilley refused, stating: "I ain't putting no shorts on. I'm going to bed. Fuck! I gotta work tomorrow. Fuck! Get out. Fuck I'm sick of this shit. That fucking drunk [inaudible]." This back-and-forth continued for another minute, with Lilley again telling the deputies to get out. At one point, after Matthews told Lilley to "just sit there and relax," Lilley responded "I'm not gonna relax. You're fucking getting me upset now. Fuck!"

About four minutes after the deputies had made initial contact with Lilley, dispatch informed them that Lilley had a no-contact order and was not permitted to be in the residence;

3

Lilley also had a court order to maintain absolute sobriety. At that point, Matthews and Dorshorst determined that they were going to arrest Lilley and take him to jail.

Matthews went back to the side of the bed closest to where Lilley was lying. Lilley was lying curled on his left side, with a blanket over him, facing toward Matthews. Matthews said, "Alright Jeff, you're not supposed to be here man, okay?" Lilley sat up halfway, gestured wildly, and yelled, "This is my house! I live here!," before returning to his side-lying position. Dorshorst held out a pair of shorts towards Lilley; Matthews told Lilley he needed to put them on. Lilley, sitting up partway again, shouted, "No, I'm not!" Matthews said, "You're going to put your shorts on." Lilley suddenly and quickly sat up, whipped the blanket aside, said "fuck you," and moved quickly towards Dorshorst. (The parties offer different characterizations of Lilley's movements: Defendants say Lilley "lunged" towards Dorshorst; Lilley says he merely "reached for" the shorts from Dorshorst to put them on. I address this dispute in more depth, below.)

In response to Lilley's sudden movement, Matthews dove across the bed and grabbed Lilley around the head and shoulders in an attempt to restrain him. Matthews testified that he tackled Lilley because, based on Lilley's refusal to cooperate, intoxicated state, and belligerent behavior up to that point, along with his sudden action of bolting upright and moving towards Dorshorst, Matthews considered Lilley an immediate physical threat to Dorshorst. Video shows Lilley grabbing the shorts out of Dorshorst's hand as Matthews tackled him. Dorshorst Body Camera at 4:30-4:31.

When Matthews tackled Lilley, Dorshorst assisted by going to Lilley's left side and attempting to take control of his left arm. After a few seconds, Lilley ended up on his knees, bent over at the waist, beside the foot of the bed. Matthews was above Lilley, half-kneeling on

4

Lilley's bed, but applying his body weight to Lilley's upper body. The deputies forced Lilley from his knees into a prone position on his stomach, with his head on a pile of clothes on the floor. As Lilley moved to the floor, Dorshorst transitioned to holding Lilley's legs to prevent him from kicking. Phillippi, who was now in the room, grabbed Lilley's left arm and placed it behind Lilley's back.

Lilley had his right arm tucked under his body at a right angle, with his elbow protruding. Matthews, now down on the floor, had his left hip across Lilley's mid-to-low back area. He yelled at Lilley to stop resisting and put his hands behind his back. According to Matthews, he tried to move Lilley's right arm behind his back but felt resistive tension in his right arm and was unable to do so. Matthews then got off of Lilley's back and used his left knee to administer two knee strikes to Lilley's right side.

After the second knee strike, Lilley pulled his right arm out from underneath him and moved his hand back to his right hip, but then tucked his right arm back under his right shoulder again. Matthews tried to pull Lilley's right arm out from underneath him but could not. He then delivered five more knee strikes to Lilley's ribs and right arm. After these strikes, Lilley brought his hand out from underneath him. Matthews was able to grab it and move it behind Lilley's back, allowing Phillippi to secure Lilley's hands in handcuffs.

Lilley complained that he could not breathe and that his ribs were broken. The deputies sat Lilley up and asked dispatch to send emergency medical services to the residence. The officers were able to find Lilley's inhaler and assisted him in taking two puffs. Lilley was eventually taken by ambulance to the hospital for further examination.

Lilley was charged with resisting or obstructing an officer based on the events of August 11, 2020. The criminal complaint alleged that Lilley "yelled, 'fuck you' and lunged towards Lt. Dorshorst" and that he "physically resisted efforts to handcuff him[.]"  Lilley was later found guilty of resisting or obstructing an officer after he pleaded no contest.

At a deposition, Lilley testified that he believed he was following the deputies' orders but he could not get both hands behind his back because his right arm was "pinned underneath" his body.  Lilley Dep., dkt. 27, at p. 58: 15-21. When asked if he resisted the officer's efforts to detain him "in any fashion," Lilley replied: "Not that I recall, no." *Id*., at p. 59: 9-11.  He said that after kneeing him in the side, Matthews eventually "yanked" Lilley's hand out from under Lilley's body and handcuffed him. *Id*. at 62:1-3.

OPINION

Defendants move for summary judgment on both the excessive force claim and the failure to intervene claim. To succeed on the motion, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law on the merits. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummet v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).  If Lilley fails to establish the existence of an essential element on which he will bear the burden of proof at trial, then summary judgment for defendants is proper. *See Celotex*, 477 U.S. at 322.  All reasonable inferences from the facts in the summary judgment record must be drawn in Lilley's favor as the nonmoving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).

**I. Excessive Force**

Lilley asserts an excessive force claim against defendant Matthews under the Fourth Amendment to the United States Constitution, which prohibits unreasonable searches and seizures. A police officer's use of force during an arrest is judged under this standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The court must consider the officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. The court must consider the officer's actions under the particular facts of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the deputies or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

Lilley contends that two distinct uses of force by Deputy Matthews were unlawful: (1) the tackle on the bed; and (2) the subsequent knee strikes.

**A. Matthews' Act of Tackling Lilley Off the Bed Was Reasonable**

Defendants seek summary judgment on this claim on two grounds. First, they argue that the undisputed facts show that no reasonable jury could find that Matthews used excessive force. Second, they argue that Matthews is entitled to qualified immunity. Under that doctrine, a plaintiff may not obtain damages for a constitutional violation against a public official unless the plaintiff shows that the official violated clearly established law. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). Law is clearly established on an excessive force claim if: (1) there is a "closely analogous case" holding that the specific type of force used by the defendant is excessive; or (2) "a general constitutional rule already identified in the decisional law applies

7

with obvious clarity to the specific conduct in question." *Cibulka v. City of Madison*, 992 F.3d 633, 639-40 (7th Cir. 2021) (internal quotation marks and alterations omitted).

"'[S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations . . . .'" *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010)). Even so, a court "may consider reasonableness as a matter of law when there are sufficient undisputed material facts to draw a conclusion." *Siler*, 957 F.3d at 759. In this case, the material facts are undisputed because there is video footage of the incident.

As discussed above, the video shows that from the time the deputies began speaking to Lilley in his bedroom until Matthews tackled him, Lilley was uncooperative and belligerent, and appeared to be intoxicated. He refused to get out of bed or get dressed, told the deputies repeatedly to get out and leave him alone, and he repeatedly swore at them. When Matthews told Lilley that he was not allowed to be at the house, Lilley became even more upset, made wild gestures, and shouted loudly that it was his house and that he was not going to put shorts on. Given Lilley's hostile attitude and behavior toward the deputies up to this point, no reasonable jury could find that Deputy Matthews acted unreasonably in tackling Lilley when, after the deputies told him again to put the shorts on, he quickly sat up from his lying position, tossed his blanket aside, said "fuck you" and moved rapidly towards Lieutenant Dorshorst.

Lilley argues that it was unreasonable for Matthews to tackle him because "Mr. Lilley was actively complying with Deputy Matthews' and Lieutenant Dorshorst's commands that he take the pair of shorts Lieutenant Dorshorst held so Mr. Lilley could dress himself." Dkt. 29, at 26.

8

The video footage does not conclusively rule out the *possibility* that this is what Lilley was doing when he bolted up and scooted quickly towards the end of the bed, in Dorshorst's direction. "But the question on an excessive force claim isn't whether the plaintiff's motives were benign or his actions could reasonably be interpreted as nonthreatening.  Rather, the question is whether the deputies' conduct was reasonable at the time, without the benefit of hindsight." *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 796 (W.D. Wis. 2021).

Whatever Lilley's subjective intent, the video shows him moving rapidly and aggressively towards Dorshorst.  As he acknowledged at his deposition, he "got up quick." Lilley Dep., dkt. 27, at 18:16-20.  Having reviewed the recordings multiple times, this court cannot determine with absolute certainty what Lilley's plans were:  maybe he *was* planning to snatch the shorts out of Dorshorst's hand and put them on in a huff.  But Matthews did not act unreasonably in not waiting to see how things played out.  From his vantage point, he was faced with an intoxicated, belligerent, physically strong person who had refused multiple times to get dressed and out of bed to speak with the deputies, who was clearly angry about being told he had to leave the residence, and who suddenly exclaimed "fuck you!", bolted upright and headed quickly towards one of Matthews' fellow deputies.  Nothing that Lilley had done up to that point reasonably suggested that in moving suddenly towards Dorshorst, Lilley had experienced a sudden change of heart and now was complying peaceably with the deputies' orders to put on his shorts.

Matthews was not required to wait until Lilley actually attacked Dorshorst or grabbed a weapon he might have had hidden nearby before taking action to ensure Dorshorst's safety. *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) ("Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself

9

from officers trying to subdue him before taking action to ensure their safety."). Regardless of the fact that Lilley's underlying offense—violating his conditions of release–-was not particularly severe, Matthews had the right under *Graham* to use force to protect his fellow officer and to effectuate an arrest.[1]

Lilley suggests that the deputies put him in an "impossible situation" by failing to hand the shorts to him directly or instruct him to get up slowly to retrieve the shorts from Dorshorst. With the benefit of speculative hindsight, it's *possible* that if the deputies had taken those steps, then *perhaps* Lilley would not have made a sudden move towards Dorshorst. But the excessive force analysis assessment depends on the perspective of a reasonable officer on the scene, who does *not* have the benefit of hindsight: he's living it in real time. Nothing in the video suggests that the deputies were deliberately setting Lilley up, that they deliberately escalated the situation, or that they expected Lilley to act as he did when they told him to put his shorts on.

In short, the undisputed facts in this case show that Matthews acted reasonably in tackling Lilley. But even if this were a closer call, Matthews would be entitled to qualified immunity. Officers don't have to show that they used the least restrictive means in protecting themselves and others. Rather, courts "give considerable leeway to law enforcement officers' assessments regarding the degree of force appropriate in dangerous situations." *Williams v.*

---

[1] Lilley has proffered a report from John J. Ryan, a police practices expert, who has opined that there was "no significant threat" to the deputies because Lilley was intoxicated, the deputies outnumbered him 3-1, they knew he had no weapons on his person, and it was "clear from the video that Lilley was following Lieutenant Doshorst's [sic] directions to take the shorts[.]" Dkt. 32, Exh. A, at ¶¶ 43, 45. But experts may not offer legal opinions. *Jimenez v. City of Chi.*, 732 F.3d 710, 720 (7th Cir. 2013). Further, Ryan's opinion is faulty because it fails to view the circumstances from the perspective of a reasonable officer in Deputy Matthews' position, who did not have the opportunity to "view the tape" to determine what Lilley was doing when he moved aggressively towards Dorshorst. Accordingly, Ryan's report fails to present a material dispute of fact precluding summary judgment for defendants.

*Indiana State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015); *see also Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."); *Dockery v. Blackburn*, 911 F.3d 458, 468-69 (7th Cir. 2018) ("Even if the officers misconstrued [the plaintiff's] actions or misjudged the amount of force needed to subdue him, qualified immunity protects officers from mistakes in judgment of this sort."). Even if Matthews was mistaken about Lilley's intent, the circumstances with which he was confronted left ample room for the exercise of judgment. Because his split-second decision to tackle Lilley was well within the bounds of reasonableness, qualified immunity is appropriate.

### B. Lilley's Claims Based on the Knee Strikes are Barred by *Heck v. Humphrey*

Regardless whether Deputy Matthews may have acted reasonably in tackling Lilley off the bed, Lilley contends that Deputy Matthews nevertheless used excessive force when he used knee strikes to get Lilley's right arm behind his back. Lilley further contends that co-defendants Phillippi and Dorshorst are also liable for Lilley's injuries because they had a realistic opportunity to intervene to prevent Matthews' excessive force.

Defendants argue that these claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). *Heck* precludes a § 1983 claim when "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless he proves that his "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's

11

issuance of a writ of habeas corpus." 512 U.S. at 486-87. It is undisputed that Lilley pled no contest to Resisting or Obstructing an Officer in violation of Wis. Stat. § 946.41(1), which provides that "whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor." It is further undisputed that the conviction has not been reversed on appeal or otherwise found invalid.

As the Seventh Circuit has explained, *Heck* does not automatically bar a person from bringing a suit for excessive force whenever the force arises in the context of an incident that led to the person's conviction. *Tolliver v. City of Chicago*, 820 F.3d 237, 243 (7th Cir. 2016). A plaintiff can proceed on an excessive force claim under § 1983 to the extent that the facts underlying the claim are not inconsistent with the essential facts supporting the conviction for resisting arrest. *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014). Thus, a plaintiff found guilty of resisting arrest could not maintain a § 1983 action premised on the claim that he did not resist being taken into custody. *Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010). However, he could proceed on a claim that the police used more force than necessary in effecting custody, or that they used excessive force after he was already subdued. *Id.*; *see also VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006) ("Were we to uphold the application of *Heck* in this case, it would imply that once a person resists law enforcement, he has invited the police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages.").

Here, the facts underlying Lilley's excessive force claim are inconsistent with the essential facts supporting his conviction for resisting an officer. As Lilley expressly concedes in his response brief, the facts underlying his criminal conviction are that Lilley "physically resisted

efforts to arrest him," specifically, that he resisted being handcuffed. Dkt. 29, at 21, n.3. However, Lilley *now* contends that his right arm was "stuck underneath his body while the three officers pinned him to the ground," and that he was "unable to put his right hand behind his back as he was instructed." *Id*. at 21. At his deposition, Lilley said he didn't recall resisting the officer's efforts to detain him "in any fashion." Lilley Dep. 59, 9-11. In other words, Lilley now contends that he was not resisting arrest at all.

Lilley attempts to circumvent the *Heck* bar by characterizing his actions as "a type of passive resistance which could form the basis for a conviction for resisting an officer." *Id*. But as defendants point out, "passive resistance" — at least of the type described by Lilley—could *not* form the basis for a conviction for resisting under Wis. Stat. § 946.41(1). To convict Lilley of resisting an officer, the State would have had to prove that:

> (1) [Lilley] resisted an officer, meaning he used force to oppose [an officer]; (2) [the officer] was acting in an official capacity; (3) [the officer] was acting with lawful authority; and (4) [Lilley] knew [the officer] was acting in his official capacity and with lawful authority and that his conduct would resist the officer.

*State v. Young*, 2006 WI 98, ¶ 78, 294 Wis. 2d 1, 41, 717 N.W.2d 729, 749 (citing Wis JI—Criminal 1765). Lilley's version of events necessarily implies the invalidity of the first element, that he "used force to oppose" an officer. In Lilley's telling, he did not "use force" to oppose being handcuffed; rather, he did not move his right arm because he was unable to do so.

This differentiates his case from *Wendricks v. Serres*, No. 20-CV-1189-PP, 2022 WL 3700887, at *10 (E.D. Wis. Aug. 26, 2022), where the court found that the plaintiff's conviction for resisting arrest did not preclude his excessive force claim where he acknowledged that he had "pulled his arm away" from the officers, who were beating and tasing him. Although

13

the court characterized this as "passive" resistance, pulling one's arm away is a voluntary act, whereas Lilley alleges that his non-compliance resulted from his physical inability to comply.[2]

Lilley's argument is more like that rejected by the court in *Tolliver v. City of Chicago*, 820 F.3d 237 (7th Cir. 2016). Tolliver was driving a vehicle when it was stopped by plainclothes police who received a tip that there were drugs in the car. Tolliver did not get out of his vehicle, but instead drove it towards the officers, who responded with gunfire; one of the officers was injured while trying to escape from Tolliver's vehicle. Tolliver later pled guilty to a charge of aggravated battery to a peace officer based on that officer's injuries. He then brought a claim of excessive force against the officers. Under his version of the facts, the officers shot him without provocation as he sat motionless in his car; this shot paralyzed him, causing him to fall over towards the right, pinning his right arm beneath him. According to Tolliver, he was unable to reach the steering wheel or move his left side and was lying on his right side. He denied that he intentionally put the car in drive, arguing that it was the involuntary and unintentional movements of his body falling over that knocked the car into drive, causing it to drift towards the officers. *Id*. at 240-41.

The court found Tolliver's version of the event incompatible with his conviction for aggravated battery of a peace officer, which required a showing that Tolliver had voluntarily and intentionally caused harm to the officer. *Id*. at 243. "[I]f the incident unfolded as Tolliver alleges in his civil suit, then he could not have been guilty of aggravated battery of a peace officer

---

[2] Even if the facts were not distinguishable, I disagree with the court's conclusion that the plaintiff's excessive force claim could proceed even though he denied that he "used force" on the defendants. *Wendricks*, 2022 WL 3700887, at *10. Wendricks' denial that he used force implies the invalidity of his conviction for resisting, which requires the use of force. *State v. Young*, 2006 WI 98, ¶ 78, 294 Wis. 2d 1, 41, 717 N.W.2d 729, 749 (citing Wis JI—Criminal 1765). The court did not cite *Young* in its decision.

because the officer shot him without provocation and was injured as a result of involuntary and unintentional actions by a paralyzed Tolliver." *Id*. at 244. Noting that Tolliver was "the master of his ground," the court found that *Heck* barred his civil suit. *Id*.

Like Tolliver, Lilley's version of events necessarily undermines the validity of his conviction for resisting arrest. In Lilley's version, his resistance to being handcuffed wasn't really resistance at all: it was involuntary and unintentional inaction caused by his arm "being stuck underneath his body." But to be guilty of resisting arrest, Lilley had to have "used force" to oppose arrest, which involves an intentional act. Stated differently, if Lilley was *unable* to comply with the deputies' directives to put his right hand behind his back, as he now contends, then he could not have been guilty of resisting arrest. So, his suit is barred by *Heck*.

Finally, Lilley compares his case to *Hardrick*, 522 F.3d 758, but the comparison is not apt. In that case, the defendant pled guilty to a charge of resisting that was based on an allegation that he "struggled while being handcuffed." *Id*. at 760. He later sued the arresting officers for excessive force, claiming that the officers exerted excessive force after he was apprehended, specifically "while he was 'peaceably waiting to be handcuffed,' and after he had been handcuffed." *Id*. at 763. The court held that although Hardrick was "straddling a fine line," his claim was not barred by *Heck* because "[t]he fact that Hardrick 'struggled while being handcuffed' at one point in time does not preclude the possibility that at another point in time, Hardrick was 'peaceably waiting to be handcuffed.'" *Id*. at 764.

In this case, however, Lilley has not identified any conceptually distinct moment during his arrest that would escape *Heck's* bar to an excessive force claim. The interaction between Lilley and the deputies once Lilley sat up was quick and linear. Although Lilley states in the

15

abstract that he is "not precluded from arguing that he did not resist arrest . . . at different points when he was on the floor," dkt. 29, at 22, he has not actually developed this kind of argument or proposed any facts to suggest that there were any temporally distinct "points" on the floor when he was offering more than so-called "minimal passive resistance" to being handcuffed. Instead, Lilley appears to argue that the entire time he was prone on the floor, he was offering the same "passive minimal resistance," *i.e.*, he was not putting his hand behind his back because he was physically unable to do so.  *See* Plt.'s Br., dkt. 29, at 22 (arguing that Matthews used excessive force when administering eight knee strikes to a subdued, naked, and unarmed suspect who was "minimally passively resisting" arrest); *id*. at 26-27 (once Lilley was prone on the ground, Matthews used excessive force when attempting to overcome Lilley's "minimal passive resistance"); *id*. at 35 ("A reasonable jury could conclude that causing serious injuries to an unarmed, subdued, and naked suspect who was passively resisting arrest by not being able to move his arm out from beneath him constitutes a callous indifference to the suspect's constitutional rights.").  If there is some other kind of "minimal passive resistance" that Lilley is alluding to, he has not identified it.

For example, Dorshorst's chest camera video shows–and Lilley concedes–that after the second knee strike, Lilley *did* pull his arm out from underneath his body and he moved it to his right hip, only to tuck it back underneath his right shoulder in defiance of the deputies' commands. Lilley further concedes that Matthews then tried to pull Lilley's right arm from underneath him "but was unsuccessful." Plt.'s PPFOF, Nos. 80-81.  In other words, the recording shows that Lilley *did* intentionally use force to oppose the deputies' efforts to handcuff him.  But Lilley doesn't argue that the knee strikes were excessive even if he was actively resisting

16

arrest; Lilley's sole theory is that he was offering "minimal passive resistance" throughout the entire encounter.

Lilley is the master of his ground, and defendants' summary judgment motion is the put-up-or-shut-up moment in his lawsuit. In the absence of an alternative theory of recovery that does not depend on allegations that contradict his conviction for resisting, the court finds Lilley's excessive force and failure-to-intervene claims based on the knee strikes barred by *Heck*.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, dkt. 10, is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 4th day of May, 2023.

> BY THE COURT:
>
> /s/
>
> STEPHEN L. CROCKER
> Magistrate Judge